UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS.

JANE DOE, individually and as guardian and ) 
next of friend of SUSIE DOE, )
*Plaintiffs* )
 )
 )    CIVIL ACTION NO. 1:26-CV-11735
v. )
 )
UNION FOR REFORM JUDAISM, DANIEL )
MEDWIN, AND JAYME MALLINDINE )
*Defendants* )
 )

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Jane Doe, individually and on behalf of her minor daughter, Susie Doe, by her attorneys, Laura D. Mangini, Esq. and Alex J. Grant, allege as follows:

## INTRODUCTION

The Plaintiff brings this action individually and as next of friend of her minor child, against Defendants, Union for Reform Judaism, Daniel Medwin, and Jayme Mallindine for negligence in failing to properly hire and train camp employees and for negligently failing to supervise campers, which allowed for Susie Doe to be sexually harassed and assaulted during the 2024 Summer Session. Plaintiff also alleges negligent infliction of emotional distress for Defendants' handling of the sexual harassment and assault, including but not limited to, Defendants' decision to force Susie Doe to return home on the first day of summer camp in 2025.

## PARTIES

1.    The Plaintiff, Jane Doe, is the parent and natural guardian of Susie Doe, a 16-year-old minor, residing in the State of Maryland. Jane Doe and Susie Doe are identified in a separate Affidavit.

2.    The Defendant, Union for Reform Judaism ("URJ") is a foreign corporation with a principal office located at 633 Third Avenue, New York, New York, and a Registered Agent listed as C T Corporation System, 155 Federal Street, Suite 700, Boston, Commonwealth of Massachusetts.

3.    The Defendant, Daniel Medwin ("Medwin" or "Rabbi Dan"), is an individual who resides at 2159 Desmond Drive, Decatur, Georgia. At all times relevant hereto, Defendant, Daniel Medwin, was a co-Director of URJ Six-Points Sci-Tech Academy.

4.    The Defendant, Jayme Mallindine ("Jayme" or "Mallindine"), is an individual who resides at 311 S Dupre Street, New Orleans, LA. At all times relevant hereto, Defendant, Jayme Mallindine, was a co-Director of URJ Six-Points Sci-Tech Academy.

1

## FACTS COMMON TO ALL COUNTS

5. Defendant, URJ, is the congregational arm of the reform Judaism Movement in North America. Its mission "is to provide vision, leadership, and programmatic support to Reform Jewish congregations and to perpetuate and advance Reform Judaism."[1]

6. As part of its activities, URJ operates approximately 15 summer camps, including regional overnight camps, one science/technology specialty camp, one sports camp, and a creative arts camp. Approximately 10,000 youths, ages 6-19, attend the camps each year.

7. URJ employs approximately 2,500 seasonal staff members, typically between the ages of 18-24, at its camps.

8. In 2021, URJ retained Debevoise & Plimpton to conduct an independent investigation of any sexual misconduct at URJ workplaces, summer camps, and programming.

9. The investigation found that, where sexual misconduct was reported at summer camps, some staff members did not handle complaints appropriately. Staff members did not properly escalate the complaints, they minimized concerns, and they criticized complainants for putting themselves in "risky" situations.

10. Additionally, remediation was found to not fully address the harm and, in many instances, legal guardians were not notified.

11. As a result, Debevoise & Plimpton recommended URJ adopt written standard operating procedures for responding to and investigating allegations of sexual misconduct.

12. As it related to youth-on-youth sexual harassment, such recommendations included, but were not limited to: (1) a standardized incident reporting process; (2) clear written protocols and procedures for escalating complaints to leadership; (3) clear boundaries as to what romantic and sexual conduct is and is not permitted among minor peers; (4) sexual misconduct training for staff members; and (5) parent notification to ensure the victim is approached appropriately and to ensure that the necessary supports are in place.

13. In 2024, URJ operated URJ Six Points Sci-Tech Academy ("Sci-Tech"), located in Byfield, Massachusetts. Sci-Tech was a summer camp for children interested in robotics, video game design, science, digital media, and other similar interests.

14. Sci-Tech employs a team of professionals who use their skills and expertise to support full-time and summer staff to ensure campers have a successful and fun camp experience. The team includes teachers, clinical social workers, school guidance counselors, special education professionals, psychologists, and graduate students.

---

[1] Constitution and Bylaws, Union for Reform Judaism, https://urj.org/who-we-are/leadership-governance/constitutionandbylaws.

2

15.    All Sci-Tech staff receive training on inclusion and how to support the variety of emotional needs each camper brings to camp.

16.    Sci-Tech holds three separate, two-week sessions, over the course of each summer.

17.    Campers and staff live in dorms and are grouped into "halls" based on age and gender. While halls are identified as either "boy" or "girl" halls, Sci-Tech also works with families of gender non-conforming campers to find the right housing for them at camp.

18.    Campers are assigned to rooms of two or three campers.

19.    Transgender and non-binary campers and staff members are housed in the space that affirms their gender identity and/or where they feel most comfortable.

20.    Counselors live on each hall to supervise, mentor, and engage campers throughout the day, both when in the dorm and at hall activities.

21.    Sci-Tech promises that showers are individual stalls, and that shower time is facilitated by counselors who ensure everyone feels safe and has the privacy they need during those vulnerable moments.

22.    Sci-Tech campers are not allowed in any room but their own, and all camper "hangouts" are to take place in the dorm common rooms.

23.    Campers are not allowed to wander freely throughout campus and should always be supervised by adult staff.

24.    Sci-Tech also has an open-door policy in the dorms, meaning doors should be kept open unless a camper is changing or sleeping.

**Susie Doe is Sexually Harassed and Assaulted by Another Camper During the 2024 Camp Sessions**

25.    In 2023, Susie Doe attended one session at URJ Sci-Tech. While there, she became friends with another camper, "E." E was assigned male at birth but had transitioned to non-binary before the summer of 2023.

26.    When Susie returned home from camp, she reported that she had loved the experience so much that she wanted to attend two sessions the following year.

27.    Susie and E, both of whom attended the same synagogue and religious school class, continued their friendship throughout the remainder of 2023 and into 2024.

28.    On July 9, 2024, Susie arrived at Sci-Tech to attend the second and third sessions of camp. She flew to camp with E, who was attending the same two sessions.

29.    Almost immediately, Susie was sexually harassed and assaulted by E.

3

30. On a regular basis, E was in Susie's room, uninvited and against camp policy, both during the day and at night.

31. When E was in Susie's room, E often refused to leave, even when Susie stated she needed to change. Instead, E promised to close their eyes.

32. E attempted, on many occasions, to hold Susie's hand. If Susie rejected E's attempt to hold her hand, E would put their hand high up on Susie's thigh or on her waist.

33. E touched Susie repeatedly under the table at meals, rubbing high up on her thigh.

34. E regularly waited for Susie outside the shower, despite promises from Sci-Tech that shower time would be facilitated by counselors, and E touched Susie under her towel on her breast and back.

35. E bragged about that fact that they were a black belt in karate, which caused Susie to feel physically intimidated by E. E made multiple comments about how they could beat Susie in a fight. Among other things, E stated, "just imagine what we do in a locked room" and "wait until I get you alone." On one occasion, E punched a wall and "jokingly" stated, "that could be you."

36. On July 17, 2024, Susie emailed a handwritten letter to her mother, Jane. In the letter, Susie disclosed the following:

I have a problem, though. So earlier in the session, everyone just thought E just liked touching/hugging/holding hands, that kinda stuff, but it's definitely not that. As the session has continued, it just keeps getting worse. Long story short: E has been sexually harassing almost everyone in our dorm, especially me and this girl named M. He's been touching me really inappropriately, staring, waiting outside the showers, and saying things that make me really … scared, I guess. I've told the counselors many times (so have everyone else in my dorm) and I've talked to Molly, but there's only so much they can do. He's still touching me and the other girls, and even if that stops, I'm still going to feel so unsafe around them. What should I do??? I need help. I don't even know why they let him be in the girls' dorm.

37. After receiving the letter, Jane reached out to Sci-Tech and asked that the letter be given to Sci-Tech Co-Director, Jayme Mallindine.

38. Jayme called Jane and let her know that this was not the first time she had received complaints about E. Jayme made it clear that she was aware of the problem, and that the staff were attempting to deal with the issue by meeting with campers.

39. Jayme also confirmed that multiple campers, including Susie, requested that E be moved out of their dorm.

40. E's mother wrote to Jane to apologize for E's assault of Susie, and E's family told Jayme that E could be moved to another dorm.

41. However, Sci-Tech did not grant the request until the end of session, alleging that there was not enough room to move E.

42. Despite its reassurance to Jane that Sci-Tech was dealing with the issue, Sci-tech/URJ staff failed to offer Susie appropriate support after her disclosure.

43. Instead, employees questioned Susie about the incidents on multiple occasions, suggesting to Susie that maybe it was a misunderstanding, as she was okay with some of her other friends hugging her, and that it could be difficult for E because of the double standard.

44. Employees also insinuated that Susie was exaggerating what happened.

45. Throughout the remainder of the camp session, Susie remained in a number of activities with E, which made Susie very uncomfortable.

46. When Susie returned home from camp, she confirmed that she wanted to return the following summer, and that there was no way she would allow E's actions take camp away from her.

47. On September 15, 2024, Jane registered Susie for the 2025 summer camp sessions. Prior to registering, Jane checked with Jayme Mallindine to confirm E would be placed in a male hall the following summer.

48. Susie soon began to show signs of anxiety. Jane would find Susie lying under her covers and crying when she should have been sleeping. When asked why she was under the covers, Susie responded that she was thinking about what E had done, and that it made it hard for her to sleep.

49. Susie would panic if touched unexpectedly. She reported that the touching gave her flashbacks to when she was at camp with E.

50. Susie was also reluctant to return to religious classes at her Synagogue, as E was in the same class. Jane spoke with the Director of the school, who assured the family that E would not be allowed near Susie.

51. However, E continued to follow Susie into the bathroom, prompting the temple to issue a rule that E could only use the single-use bathrooms.

52. At one point, E was prohibited from attending religious classes and could not be at the temple without a parent present. E's parents were required to provide 48-hour notice if E were to be at services so that Susie could decide if she would attend services.

5

53. On January 28, 2025, Jayme Mallindine reached out to Jane to check on Susie. Jane provided Jayme with an update on Susie's symptoms and the fact that she had returned to therapy. Jayme responded by thanking Jane for the update and confirming that one of the reasons she had reached out was to "fully understand how Susie was doing so that [the Camp] could best prepare to support her" in the upcoming summer. Jayme further suggested that the camp consulting psychologist get in touch with Jane and Susie to "begin the process of creating a thorough support plan for Susie in advance of the summer."

54. Sometime thereafter in late January or early February of 2025, Jayme contacted Jane to let her know that E could not attend the first session of the camp. Jayme asked if Susie would be willing to switch to Session 1, or only attend one of the two remaining sessions, to avoid being at camp at the same time as E. However, Susie was adamant that she attend Session 2 and 3, as that is when her friends were attending. She also stated that so long as E respected her boundaries, she would be okay.

55. On February 20, 2025, Jane spoke with Dr. Rachel Schein, Sci-Tech's consulting psychologist, about Susie's experience, as the first step in setting up a comprehensive plan for supporting Tessa at camp. During the conversation, Dr. Schein said, "We don't know what actually happened" and that "it doesn't matter what actually happened."

56. On February 24, 2025, Jane spoke with Dr. Schein and Jayme. After sharing the details that Susie had recently revealed (as described in ¶¶29-34), Jane stated that E should not be allowed back at camp, especially when Susie was there. However, Jayme and Dr. Schein stated that the decision ultimately was not up to them, but that they would speak with the "higher-ups."

57. On March 12, 2025, Jayme emailed Jane to let her know that E's status at Sci-Tech was not confirmed, but that it would not be a "healthy option" for E and Susie to be at camp at the same time. However, given that Susie had signed up months prior, Sci-Tech was not going to ask her to switch sessions or shorten her stay.

58. On April 17, 2025, Jayme and Dr. Schein spoke with Susie's therapist. There was no additional follow-up with Jane (or Susie) until June 13. On June 13, Jayme emailed Jane, stating:

Emerson and Sammy would be happy to connect with Susie privately when she arrives, after she meets her assigned counselors, so they can come up with a safety plan/person based on which staff person she feels she connects with most on the hall since Sammy and Emerson won't always be there.

59. Jayme's suggestion to wait until camp to develop a safety plan is outside the typical camp protocol, as confirmed in an email by Jane and Susie's rabbi, Rachel Ackerman:

As a side note – do you have any email communications between you and camp leadership where they suggested waiting until arriving at camp for a conversation between Susie and

6

staff. As I said, that type of suggestion would be quite surprising to me and likely outside of typical camp protocol and that was actually the most surprising part to me about the entire situation.

60. On July 8, 2025, Susie returned to Sci-Tech Academy. She woke up happy and excited to return to camp. She arrived at camp around 2:00 p.m.

61. At 8:30 p.m., Jane received a phone call from Rabbi Dan Medwin, co-Director of Sci-Tech Academy. Rabbi Dan stated that he did not believe Susie was "healed enough[2]" to be at Sci-Tech for the summer, as Sammy and Emerson had pulled Susie aside when she got to camp and asked her if she felt safe at camp. When Susie stated "no", they asked if she trusted camp staff, and she again said no.

62. According to Rabbi Dan, Susie also stated that she would not go to an adult if something happened and that there were people on her hall she did not want to hug, but that she didn't want to tell them. Rabbi Dan believed Susie was "setting herself up to feel violated again."

63. This is disputed by Susie, who reported that that when asked if she would go to an adult if something happened, she said yes. She also stated that she said she trusted Sammy to keep her safe.

64. Rabbi Dan also reported that he was concerned Susie would self-harm. However, Susie had never threatened or engaged in self-harm at any point prior to the conversation.

65. When Jane asked Rabbi Dan to have another conversation with Susie and reconsider his decision, he refused, stating he was pretty certain in his decision.

66. Rabbi Dan also informed Jane that neither Sammy, Emerson, or Jayme had thought Susie needed to return home, but that they changed their minds after he presented his point of view.

67. Rabbi Dan said that Susie could not be trusted, as she had "lied to his face," referring to the prior summer when he asked her if she was okay, and she told him that everything was fine.

---

[2] Rabbi Dan's position is in direct conflict with Sci-Tech's messaging on its website, which states: "We work closely with campers, parents, clinicians, and other professionals to determine readiness after a mental health struggle that may have resulted in hospitalization.  We know that with time and the right supports, children can return to camp and have a very successful experience.  We hope to be a supportive and nurturing environment for kids on their mental health journeys, recognizing that while Sci-Tech is not a therapeutic camp, camp can be therapeutic. We also talk with families about helping their child be able to "tell their story" in a way that does not put any pressure on their peers to do more than be a listening ear and a supportive presence."

68. Rabbi Dan also blamed Susie for traumatizing her friends by discussing what happened the prior year.

69. Rabbi Dan continued to blame Susie for not fully disclosing what had happened, as he referenced the fact that she told Sammy and Emerson that there were still some details about the incidents with E that she had not told anybody.[3]

70. Rabbi Dan compared Susie's situation to a child who said they were going to hurt someone or themselves. He said that if Susie wouldn't tell an adult if she was hurt, Sci-Tech could not keep her safe.

71. Rabbi Dan refused to let Jane speak directly to Susie.

72. After hanging up with Rabbi Dan, Jane called Sci-Tech and asked to speak with Jayme.

73. Jane was informed that Jayme would call her back the following morning, as it was already 10 p.m. Jayme never called her back.

74. Jane then texted Rabbi Dan to ask if they could speak again, and he agreed to speak with her the next morning. She also emailed both Jayme and Rachel Handloff, asking to speak with them.

75. On July 9, 2025, Jane spoke to Rabbi Dan, Jayme, and Rachel Handloff. John Doe, Susie's father, was also on the call. During the conversation, Jane attempted to get Rabbi Dan to change his mind about expelling Susie from camp, suggesting that if his concern was that Susie would not report harassment or assault to an adult, Susie could sign a pledge in which she would agree to immediately report anything that happened to a staff member.

76. The Directors ignored Jane's attempts at compromise, instead continuing to blame Susie for not immediately sharing all of the details of the sexual assaults the previous summer and stating that Susie's mental health was a lot worse than expected, despite the conversations with Susie's therapist.

77. Jayme stated that the camp relied on self-advocacy to keep kids safe, and that they didn't believe Susie could advocate for herself, so they simply could not keep her safe.

---

[3] This is also in direct conflict with the stated policy. The URJ policy, which is linked from the Sci-Tech camp website (https://6pointsscitech.org/about-us/faqs/), states: "Recognize this may be difficult for the youth, and they might not be ready to tell you everything."

78. It quickly became evident that the July 9 phone call was merely a pre-text for arranging a flight home for Susie, and not an opportunity to find a solution other than expelling her from camp.

79. Leadership's removal of Susie from Sci-Tech was in and of itself traumatizing. Leadership sent Sammy to find Susie, telling Susie that Sammy and Emerson needed to have a follow-up conversation with her.

80. Instead, Susie was led into an office with Rabbi Dan and another woman that she had never met. Rabbi Dan told Susie that she would be going home, and that she had no control over the decision, nor did her voice matter, as she would just lie in order to stay at camp.

81. Susie asked multiple times if she could leave the meeting because she felt uncomfortable and scared, and was hyperventilating. Rabbi Dan told her she could not leave.

82. She asked if she could say goodbye to her friends. Rabbi Dan refused.

83. Susie's friends later reported that it was made to seem as though Susie wanted to leave, and that everyone had assumed she had a panic attack.

84. Susie was then hustled into a van with two other women she had never met, and driven to her hall, where the women packed her things up.

85. Susie was upset, crying, and in shock.

86. She was then put back into the van with the two women, and brought to the airport. Susie arrived home later than night, betrayed and heartbroken.

87. As a result of Defendants' decision to expel Susie from Sci-Tech, Susie shut down emotionally, became avoidant, and was unable to speak about what happened to her.

88. As a result of Defendants' negligence, Susie Doe continues to experience physical and emotional distress, as well as a loss of religious opportunity.

**COUNT 1**
**Jane Doe, ppa Susie Doe v. Union for Reform Judaism**
*Negligence*

89. Plaintiff restates and realleges the assertions contained in Paragraphs 1-88 of this Complaint and incorporates them by reference herein.

90. Defendant, Union for Reform Judaism, has a non-delegable duty to ensure the safety of its campers.

91. Defendant, Union for Reform Judaism, breached that duty by committing the following negligent acts or omissions, including but not limited to:

   a. Negligently failing to provide a safe environment for campers entrusted to its care;

   b. Negligently training its employees;

   c. Negligently addressing complaints from campers about E, even after learning E was inappropriately touching female campers and making them feel uncomfortable;

   d. Failing to follow proper policies and procedures related to its "open door policy";

   e. Breaching its promise to families that shower time was facilitated by counselors to ensure campers were safe and had the necessary privacy they needed;

   f. Improperly handling Susie Doe's return to camp in the summer of 2025, and expelling her on the first day;

   g. Such other negligent and improper actions as may be discovered in the further investigation and pre-trial discovery of this claim.

92. As a direct and proximate result of Defendant's negligence, minor Plaintiff Susie Doe, was harmed and sustained physical injuries, emotional injuries, mental anguish, embarrassment, humiliation, pain, diminished childhood, loss of religious opportunities, loss of life pleasures, and loss of educational opportunity, many of which are permanent and continuing in nature.

93. As a direct and proximate result of Defendant's negligence, the minor Plaintiff Susie Doe suffered physical injuries, incurred medical treatment and bills, and will likely be caused to incur medical expenses, including counseling, in the future.

94. As a direct and proximate result of Defendant's negligence, the minor Plaintiff Susie Doe will likely incur a loss of earning capacity in the future.

95. The injuries outlined herein were caused by the negligence of Defendant with the negligence and other tortious conduct of other Defendants further alleged throughout this Complaint and was in no manner whatsoever due to any act or failure to act of the Plaintiff, Jane Doe.

WHEREFORE, the Plaintiff, Jane Doe, as guardian of Susie Doe, prays for judgment against the Defendant, Union for Reform Judaism, in a reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## COUNT 2
### Jane Doe, ppa Susie Doe v. Union for Reform Judaism
*Negligent Infliction of Emotional Distress*

96.     Plaintiff restates and realleges the assertions contained in Paragraphs 1-95 of this Complaint and incorporates them by reference herein.

97.     Because of Defendant's negligence and failures, as herein described, minor Plaintiff was caused to sustain severe emotional distress and suffering, which resulted from the sexual harassment and assault of the minor Plaintiff, Susie Doe, while under Defendant, Union for Reform Judaism's care, custody, and control.

98.     A reasonable person would have suffered emotional distress under the circumstances in which the minor Plaintiff suffered emotional distress.

WHEREFORE, the Plaintiff, Jane Doe, as guardian of Susie Doe, prays for judgment against the Defendant, Union for Reform Judaism, in a reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## COUNT 3
### Jane Doe, ppa Susie Doe v. Union for Reform Judaism
*Breach of Fiduciary Duty*

99.     Plaintiffs restate and reallege the assertions contained in Paragraphs 1-98 of this Complaint and incorporates them herein by reference.

100.    Susie Doe, who was a minor when she was sexually harassed and assaulted by E, placed her trust and confidence in Defendant, Union for Reform Judaism.

101.    The Defendant, Union for Reform Judaism, acts as a fiduciary to the minor children entrusted to its care and attention of its counselors and directors acting on behalf of the Defendant, Union for Reform Judaism, owed the minor Plaintiff, Susie Doe, a duty of trust and loyalty.

102.    The Defendant, Union for Reform Judaism, breached its fiduciary duty owed to the minor Plaintiff, Susie Doe, and abused its position of trust and confidence.

103.    As a direct and proximate result of Defendant's careless and wrongful acts and omission, minor Plaintiff, Susie Doe, was sexually harassed and assaulted by E, and suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, and psychological injuries.

104.    The minor Plaintiff, Susie Doe, was prevented from and will continue to be prevented from performing her normal daily activities and obtaining the full enjoyment of her life,

has incurred and will continue to incur loss of income and/or earning capacity, and has incurred and will continue to incur expenses for psychological treatment, therapy, and counseling.

WHEREFORE, the Plaintiff, Jane Doe, as guardian of Susie Doe, prays for judgment from the Defendant, Union for Reform Judaism, in a reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## COUNT 4
### Jane Doe, ppa Susie Doe v. Union for Reform Judaism
#### *Vicarious Liability*

105.   Plaintiff restates and realleges the allegations contained in paragraphs 1 -104 of this Complaint and incorporates them by reference herein.

106.   The Defendant, Union for Reform Judaism, is vicariously liable for the acts of its employees, agents, and/or servants, including Jayme Mallindine, Daniel Medwin, and others.

WHEREFORE, the Plaintiff, Jane Doe, as guardian of Susie Doe, prays for judgment against the Defendant, Union for Reform Judaism, in reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## COUNT 5
### Jane Doe, ppa Susie Doe v. Daniel Medwin
#### *Negligence*

107.   Plaintiff restates and realleges the allegations contained in paragraphs 1 -106 of this Complaint and incorporates them by reference herein.

108.   Defendant, Daniel Medwin, as Director of Sci-Tech, owed a duty to all campers, including Susie Doe.

109.   Defendant, Daniel Medwin, breached that duty by committing the following negligent acts or omissions, including but not limited to:

   a.   Negligently failing to provide a safe environment for campers entrusted to his care;

   b.   Negligently training his employees;

   c.   Negligently addressing complaints from campers about E, even after learning E was inappropriately touching female campers and making them feel uncomfortable;

   d.   Failing to follow proper policies and procedures related to its "open door policy";

12

e.  Breaching the promise made to families that shower time was facilitated by counselors to ensure campers were safe and had the necessary privacy they needed;

f.  Improperly handling Susie Doe's return to camp in the summer of 2025, and expelling her on the first day;

g.  Such other negligent and improper actions as may be discovered in the further investigation and pre-trial discovery of this claim.

110.  As a direct and proximate result of Defendant's negligence, minor Plaintiff Susie Doe was harmed and sustained physical injuries, emotional injuries, mental anguish, embarrassment, humiliation, pain, diminished childhood, loss of religious opportunities, and loss of life and life's pleasures, many of which are permanent and continuing in nature.

111.  As a direct and proximate result of Defendant's negligence, the minor Plaintiff Susie Doe suffered physical injuries, incurred medical treatment and bills, and will likely be caused to incur medical expenses, including counseling, in the future.

112.  As a direct and proximate result of Defendant's negligence, the minor Plaintiff Susie Doe will likely incur a loss of earning capacity in the future.

113.  The injuries outlined herein were caused by the negligence of Defendant with the negligence and other tortious conduct of other Defendants further alleged throughout this Complaint and was in no manner whatsoever due to any act or failure to act of the Plaintiff, Jane Doe.

WHEREFORE, the Plaintiff, Jane Doe, as guardian of Susie Doe, prays for judgment against the Defendant, Daniel Medwin, in reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## COUNT 6
### Jane Doe, ppa Susie Doe v. Daniel Medwin
### *Negligent Infliction of Emotional Distress*

114.  Plaintiff restates and realleges the assertions contained in Paragraphs 1-113 of this Complaint and incorporates them by reference herein.

115.  Because of Defendant's negligence and failures, as herein described, minor Plaintiff was caused to sustain severe emotional distress and suffering, which resulted from the sexual harassment and assault of the minor Plaintiff, Susie Doe, while under Defendant, Daniel Medwin's care, custody, and control.

116.  A reasonable person would have suffered emotional distress under the circumstances in which the minor Plaintiff suffered emotional distress.

13

WHEREFORE, the Plaintiff, Jane Doe, as guardian of Susie Doe, prays for judgment against the Defendant, Daniel Medwin, in a reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## COUNT 7
### Jane Doe, ppa Susie Doe v. Jayme Mallindine
### *Negligence*

117.    Plaintiff restates and realleges the allegations contained in paragraphs 1 -116 of this Complaint and incorporates them by reference herein.

118.    Defendant, Jayme Mallindine, as Director of Sci-Tech, owed a duty to all campers, including Susie Doe.

119.    Defendant, Jayme Mallindine, breached that duty by committing the following negligent acts or omissions, including but not limited to:

   a.   Negligently failing to provide a safe environment for campers entrusted to her care;

   b.   Negligently training her employees;

   c.   Negligently addressing complaints from campers about E, even after learning E was inappropriately touching female campers and making them feel uncomfortable;

   d.   Failing to follow proper policies and procedures related to its "open door policy";

   e.   Breaching the promise made to families that shower time was facilitated by counselors to ensure campers were safe and had the necessary privacy they needed;

   f.   Improperly handling Susie Doe's return to camp in the summer of 2025, and expelling her on the first day;

   g.   Such other negligent and improper actions as may be discovered in the further investigation and pre-trial discovery of this claim.

120.    As a direct and proximate result of Defendant's negligence, minor Plaintiff Susie Doe was harmed and sustained physical injuries, emotional injuries, mental anguish, embarrassment, humiliation, pain, diminished childhood, loss of religious opportunities, and loss of life and life's pleasures, many of which are permanent and continuing in nature.

121.    As a direct and proximate result of Defendant's negligence, the minor Plaintiff Susie Doe suffered physical injuries, incurred medical treatment and bills, and will likely be caused to incur medical expenses, including counseling, in the future.

122.    As a direct and proximate result of Defendant's negligence, the minor Plaintiff Susie Doe will likely incur a loss of earning capacity in the future.

14

123. The injuries outlined herein were caused by the negligence of Defendant with the negligence and other tortious conduct of other Defendants further alleged throughout this Complaint and was in no manner whatsoever due to any act or failure to act of the Plaintiff, Jane Doe.

WHEREFORE, the Plaintiff, Jane Doe, as guardian of Susie Doe, prays for judgment against the Defendant, Jayme Mallindine, in reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## COUNT 8
### Jane Doe, ppa Susie Doe v. Jayme Mallindine
*Negligent Infliction of Emotional Distress*

124. Plaintiff restates and realleges the assertions contained in Paragraphs 1-123 of this Complaint and incorporates them by reference herein.

125. Because of Defendant's negligence and failures, as herein described, minor Plaintiff was caused to sustain severe emotional distress and suffering, which resulted from the sexual harassment and assault of the minor Plaintiff, Susie Doe, while under Defendant, Jayme Mallindine's care, custody, and control.

126. A reasonable person would have suffered emotional distress under the circumstances in which the minor Plaintiff suffered emotional distress.

WHEREFORE, the Plaintiff, Jane Doe, as guardian of Susie Doe, prays for judgment against the Defendant, Jayme Mallindine, in a reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

## COUNT 9
### Jane Doe v. All Defendants
### Loss of Consortium

127. Plaintiff restates and realleges the assertions contained in Paragraphs 1-126 of this Complaint and incorporate them by reference herein.

128. As a direct and proximate result of the Defendants' conduct, the Plaintiff, Jane Doe, suffered the loss of benefit of the full services, society, and affection of her minor daughter, Susie Doe.

WHEREFORE, the Plaintiff, Jane Doe, prays for judgment against all Defendants in a reasonable amount, together with interest, costs, expert witness fees, attorneys' fees, and such other and further relief as the Court may deem just and proper.

**PLAINTIFFS HEREBY DEMANDS A TRIAL BY JURY ON ALL COUNTS**

15

Respectfully submitted,    4/14/26

The Plaintiffs,

Laura P. Mangini, Esq. (BBO#684620)
Alekman DiTusa, LLC
1550 Main Street, Suite 401
Springfield, MA 01103
Tel. (413) 781-0000
(413) 827-0266 FAX
laura@alekmanditusa.com


Alex J. Grant, Esq. (BBO # 629754)
Alekman DiTusa, LLC
1550 Main Street, Suite 401
Springfield, MA 01103
Tel. (413) 781-0000
(413) 827-0266 FAX
alex@alekmanditusa.com